

Joseph R. Prast

Partner, Audit & Assurance, Deloitte & Touche LLP

555 Mission Street, Suite 1400

San Francisco, CA 94105

Dipti S. Gulati

Chair and CEO of U.S. Audit & Assurance, Deloitte & Touche LLP

30 Rockefeller Plaza

New York, NY 10112

CC:

<u>Audit Committee, C3.ai Inc.</u>

Michael G. McCaffery, Chair

Richard C. Levin

Lisa A. Davis

<u>Securities & Exchange Commission</u>

Gary Gensler, Chair of the U.S. Securities and Exchange Commission

Paul Munter, Chief Accountant, Office of the Chief Accountant


Dear Mr. Prast and Ms. Gulati,

My name is Sahm Adrangi and I am the Chief Investment Officer of Kerrisdale Capital Management. I am writing to bring to your attention serious accounting and disclosure issues at your client C3.ai, Inc., a publicly listed technology company based in Redwood City, CA. I believe these allegations deserve the immediate attention of Deloitte & Touche LLP, as well as the Securities and Exchange Commission. You will soon begin preparing the audited financial statements of C3.ai for the fiscal year ending April 30, 2023. Please examine the contents of this letter as you engage in your review, to ensure that the company cannot use fraudulent accounting conventions to mislead investors and damage the integrity of the public markets.

In our opinion, C3.ai has utilized highly aggressive accounting to inflate its income statement metrics in order to meet sell-side analyst estimates for revenue and certain profit metrics, and to conceal significant deterioration in its underlying operations. In this letter, we discuss:

- The highly conspicuous growth in unbilled receivables to levels we've never before seen in software companies
- Opaque, confusing and highly concerning disclosures and financials related to the company's related party and very large customer, Baker Hughes



- Efforts to inflate gross profit margins by reclassifying costs of revenue as research and development expenses
- Classification of significant revenue as subscription revenue that in actuality is services- or consulting-oriented revenue
- Significant turnover in chief financial officers, and the appointment of successively less qualified CFOs over time

Please note that Kerrisdale is short shares of C3.ai and we provide a link to full disclosures at the end of this letter. While we may be short shares of the company, the American public markets have no place for deceitful accounting, and financial statements need to reflect underlying business fundamentals, instead of being used as a tool to fool market participants by painting a false portrait of a company's profit and loss.

**Days Sales Outstanding and Unbilled Receivables**

Over the past year, the company's accounts receivable have ballooned, with total accounts receivable more than doubling while quarterly revenue has declined. This has led to a cumulative negative cash flow statement entry of -$76m owing to changes in accounts receivable over the past four quarters. (Over the past five quarters, that figure is an even more negative -$117m.) Given C3.ai generated last-twelve-months revenue of just $267m, this cash flow discrepancy due to growing receivables accounted for over a quarter of revenue, a material sum. Days sales outstanding (DSO) has ballooned to 197 days[1], a level unheard of among software companies, which C3.ai claims to be.

These growing receivables are, in large part, the result of the dramatic growth in "unbilled receivables". Unbilled receivables have grown from less than $10m in each quarter prior to April 2022 to $88m in the most recent quarter. This growth in unbilled receivables, in turn, is primarily due to the growth in unbilled receivables from one customer – Baker Hughes. A metric that was previously unreported, unbilled receivables from Baker Hughes has grown from $17m in the quarter ending April 30, 2022 to $80m in the most recent quarter, and now accounts for 91% of the total unbilled receivables figure.

Below we show a chart demonstrating the growth in DSO for total accounts receivable, total unbilled receivables and total Baker Hughes unbilled receivables.



[1] Days sales outstanding calculated as most recent quarter-end receivables / quarterly revenue * (365/4), and is not average DSO.



What exactly is going on? In the last four quarters, C3.ai has apparently recognized $80m of receivables (from a related party shareholder, no less) in an amount that is equivalent to almost 30% of total company-wide revenue during that same period, for which it has not even invoiced. It appears to us that C3.ai is booking fictional revenue in order to meet consensus analyst estimates and cover up the fact that, in reality, its products are unable to get traction with customers and its business is failing. With the company unable to invoice 30% of its reported revenue, which just so happens to come from a related party, how exactly are you as its auditor signing off on these financial statements?

Conspicuously, while unbilled receivables from Baker Hughes have ballooned, actual revenue from Baker Hughes has been stagnant. In the most recent quarter, "revenue related to the arrangement" – whatever that's supposed to mean – increased to $35.8m from $34.2m in the year prior. Thus, unbilled receivables from Baker Hughes have increased 5x since being first reported, yet actual revenue is growing at a low single digit rate? To reiterate, we believe the company is using highly aggressive accounting in order to meet sell-side analyst estimates, and both its internal accounting staff and external accounting firms signing off on this charade are complicit. Below, we paste the relevant section of the most recent quarterly report, to put the discrepancies in broad daylight.

Under this revised arrangement, the amount of consideration may increase if Baker Hughes exceeds certain thresholds and as a result, the Company estimated variable consideration subject to the constraint guidance at the date of revised arrangement utilizing both historical information and current trends. At the end of each reporting period, the Company will review and update the estimate as additional relevant information becomes available.

Revenue recognized under the arrangement were as follows (in thousands):

|  | Three Months Ended January 31, | | Nine Months Ended January 31, | |
| --- | --- | --- | --- | --- |
|  | 2023 | 2022 | 2023 | 2022 |
| Direct subscription | $ 20,316 | $ 19,744 | $ 55,884 | $ 39,964 |
| Direct professional services | 8,599 | 4,891 | 8,749 | 12,889 |
| Total revenue from direct subscription and professional services | 28,915 | 24,635 | 64,633 | 52,853 |
| Total revenue from certain customers in Oil and Gas field related to the Baker Hughes arrangement | 6,869 | 9,592 | 22,138 | 18,076 |
| Total revenue related to the arrangement | $ 35,784 | $ 34,227 | $ 86,771 | $ 70,929 |

As of January 31, 2023 and April 30, 2022, balances related to Baker Hughes that are reported within accounts receivable, net (inclusive of unbilled receivables of $79.6 million and $16.5 million, respectively) included $82.1 million and $35.8 million, respectively, and deferred revenue, current included $0.3 million and $0.1 million, respectively.

*C3.ai 10-Q filed March 3, 2023*

**More Problems with the Baker Hughes Relationship**

More broadly, accounting red flags abound with the Baker Hughes relationship. Disclosures in the company's SEC filings are generally unintelligible, and the accounting surrounding C3's financial reporting as it relates to the Baker Hughes business is unlike anything we've seen before. All we can tell is that revenue and profit are being booked to boost income statement figures, the requisite amount of cash is not coming to the company, and an array of convoluted accounting representations are being used to justify why this is all okay.

To begin with, the Baker Hughes subscription revenue is being recognized at 99%+ gross margins, according to footnotes in its income statement – for instance, in the most recent 10Q, C3.ai reported $56m of related party subscription revenue over the past nine months, yet zero related party



subscription cost of revenue. (Baker Hughes is the only related party that the company discloses selling to, so presumably all related party sales are associated with Baker Hughes).

Why does C3.ai want to inflate its gross margin? We believe it does so because it regularly pretends to be a software-as-a-service company instead of the services-intensive consulting business that we believe it really is. Software companies trade at much higher valuation multiples than consulting businesses, and we believe that the Baker Hughes 100%-gross-margins gimmick is one of numerous tricks management has adopted to prop up its stock price – successfully, we might add, since the market is valuing shares of C3 at a $5bn+ fully diluted market capitalization despite poor financial and business metrics, including -$150m negative cash flow from operations on $267m of revenue over the past twelve months, a year-over-year decline In quarterly revenue, and an inability to grow customer count over the past two quarters.

Given the supposed lack of costs associated with the Baker Hughes revenue, is it fair to even classify the Baker Hughes business as subscription or services revenue? Isn't the Baker Hughes business, in reality, just some sort of non-recurring, multi-year payout that Baker Hughes is making because it was given deeply discounted shares in June 2019 that generated a rapid windfall profit when C3.ai IPO'd soon thereafter at a dramatically higher valuation? After all, the contract seems to be amended year after year, with Baker Hughes' current-year revenue commitments continually ratcheted down, as it becomes clear that the true software product revenue coming from C3's artificial intelligence solutions are failing expectations.

With real software companies, the software business makes sales to a customer; the customer utilizes the product; the software company books some costs to generate those sales, and the income statement transparently reports the transactions without a wide variety of convoluted, massive working capital fluctuations. Why isn't this happening with the Baker Hughes "arrangement"? And why can't what's actually going on be clearly articulated in C3.ai's financial statements? If the emperor is wearing no clothes, it's the auditor's job to require the company to disclose it as such. If revenue from Baker Hughes is not due to the sale and use of actual software by customers, but because of some non-recurring contractual obligation that will soon expire, then explain, in plain English, that this is the case. Re-classify the revenue as a separate line item instead of misleadingly stuffing it into subscription software. Otherwise, investors are being conned into believing that revenue is comprised of bona fide recurring sales when it's not. To what extent are you complicit in assisting the client in dressing up its numbers so that management can continue enriching itself with obscenely overvalued share-based compensation?

Finally, it's no coincidence that C3's disclosures regarding its financial relationship with Baker Hughes are often inscrutable gibberish. If one is trying to cover up a failing business relationship with its largest customer via aggressive, non-standard accounting, then using opaque, indecipherable language is the expedient way to provide relevant disclosures. We paste below sentences from the filings that make no sense to either us or probably any investor reading the SEC filings:



- *"Beginning in the fiscal year ending April 30, 2023, Baker Hughes' annual commitments are reduced by any revenue the Company generates from certain customers. Known and estimable revenue from certain customers related to the arrangement is a form of variable consideration, which was determined at contract inception and reduced the revenue recognized from the arrangement."* P. 27, 10-Q filed March 3, 2023
- *"Pursuant to this revised arrangement, the frequency of payments due from Baker Hughes is accelerated, Baker Hughes obtained expanded reseller rights and the Company will provide additional products and services. This results in an increase of the transaction price by eliminating potential variable consideration attributable to any revenue the Company generated from certain customers."* P. 27, 10-Q filed March 3, 2023
- *"Under this revised arrangement, the amount of consideration may increase if Baker Hughes exceeds certain thresholds and as a result, the Company estimated variable consideration subject to the constraint guidance at the date of revised arrangement utilizing both historical information and current trends."* P. 34, 10-Q filed March 3, 2023

Huh? What in god's name is the company trying to say? C3.ai's financial discussion of its Baker Hughes "arrangement" makes a mockery of not just the SEC's reporting requirements, but also the English language.

**Inflated Gross Margins**

Our diligence into the company's operations, attained via speaking with customers, competitors, former employees and industry experts, leads us to believe that much of the company's product sales are consulting- and services-oriented in nature. Yet the company reports the vast majority of its revenue as subscription software, and reports a gross margin exceeding 70%. And then the company reports research and development expenses that, in both the most recent quarter and last twelve months, exceed the entirety of its gross profit!

Using basic common sense – knowing the type of business C3.ai operates and the sorts of solutions it provides – it seems to us that the company is re-classifying costs from cost of revenue to research and development expense. Its motivation for doing so seems obvious. As mentioned earlier, software companies with high gross margins and recurring software revenue receive much higher trading multiples in the public markets. These higher multiples translate to higher share prices and thus greater compensation for C3.ai management, which rewards itself generously with stock options and restricted stock units. In fact, by our calculation, diluted share count is currently a staggering 38% higher than the company's basic share count, due to the company's bountiful issuance of share-based compensation. The higher the share price, the richer management can become off of this clearly struggling business.

Software companies with recurring software sales and high gross margins can rightly deserve high multiples, as operating expenses can be easily ratcheted down. But in the case of C3.ai, we believe they can't be. Due to the nature of its product offerings, we believe substantial costs are incurred developing, onboarding and maintaining each client-specific and bespoke solution that the company provides to each customer. Based on our business diligence, the company doesn't provide the sort of scalable



software-as-a-service offering that typically comes with high incremental gross margins. Therefore, we believe that C3.ai is hiding costs within research and development expenses that should be classified as costs of revenue.

We also question whether so much of the company's revenue should be classified as "subscription" software in the first place. Again, because of the highly customized nature of C3's offerings, its sales seem to us as mainly services and consulting projects, as opposed to true subscription software. In fact, in its financial statement notes, C3 discloses that its "subscription revenue" includes "stand-ready COE support services" and "maintenance and support services." How can the company's auditors and regulators not force C3 to accurately separate these services from reported software revenue? For example, when we purchase a software subscription to Microsoft Word or Adobe Acrobat, we don't have a team of highly paid Microsoft and Adobe artificial intelligence engineers spending weeks to months building out a customized Word or Acrobat application for our specific business use case, and then providing extensive ongoing maintenance and support to ensure the applications continue to work as intended. In our mind, C3's sales aren't any closer to being subscription revenue than Deloitte's own fee revenue that it generates from its audit clients.

**Significant Turnover in Chief Financial Officers**

C3 has cycled through 4 different chief financial officers over the last four years – a clear red flag for its auditor – which is perhaps unsurprising since we wouldn't want to be the executive forced to sign off on the company's accounting either.

| Name | Date | Age |
| --- | --- | --- |
| Juho Parkkinen | 03/01/2022 – Present | 38 |
| Adeel Manzoor | 12/03/2021 – 02/28/22 | 46 |
| David Barter | 10/2020 – 12/03/2021 | 49 |
| Marc Levine | 04/2019 – 10/2020 | 59 |

Equally as striking, the qualifications of its chief financial officers, in terms of stature, depth of experience and even age, have deteriorated over time, in lockstep with the decline in the quality of C3's financial reporting. Marc Levine, who served until 2020, was previously the chief financial officer of Athenahealth, a large software provider which was recently acquired by Bain for $17bn. David Barter had been the CFO at publicly listed Model N, Inc., currently valued at $1bn. Adeel Manzoor had previously been the CFO of Telenav, which was acquired for $240m in 2021. And the current CFO, 38-year-old Juho Parkkinen, had no prior chief financial officer experience before becoming C3's latest CFO. Unfortunately, this race to the bottom makes sense to us – why would any competent chief financial officer with a quality resume join a company with financial statements as aggressive and inexplicable as C3.ai's, and risk ruining their reputation.

When 59-year-old, former CFO of Athenahealth Marc Levine was at the helm, the company reported a days sales outstanding of 72. With 38-year-old, former CFO of nothing Juho Parkinnen in charge, the



company reports days sales outstanding of 197 and a research and development expense greater than its gross profit.

**Conclusion**

Deloitte doesn't need to rubber stamp fraudulent accounting. Either require the company to come clean in its upcoming audit or resign and let C3.ai management sully the reputation of a lesser audit firm.

Sincerely,

Sahm Adrangi
Chief Investment Officer
Kerrisdale Capital Management, LLC

*Disclosure: Kerrisdale Capital Management and its affiliates (collectively, "Kerrisdale") are short shares of and own put options on C3.ai and stand to realize gains in the event that the price of the stock decreases. Please read our full disclaimer at [kerrisdalecap.com/legal-disclaimer-3](kerrisdalecap.com/legal-disclaimer-3).*